# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

**UNITED STATES OF AMERICA**

v.  Case No. 5:24-cr-124

**ASHLEY TONEY**

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the Defendant, Ashley Toney, by counsel, and submits this Memorandum outlining the various 18 U.S.C. § 3553(a) factors for the Court's consideration. For the reasons set forth below, Ms. Toney requests a sentence of 5 years' probation with the first 3 years to be served on home confinement.

### I. BACKGROUND

Ashley Toney is the 25-year-old daughter of Wesley and Rhonda Toney and mother to a 15-month-old son, M.A.. Born in November 1999 in Beckley, West Virginia, Ashley was raised in a loving, stable, Christian household where father worked as a coal miner and her mother worked as a school cook to support her and her younger brother. Growing up, Ashley was a bit of a "tomboy" and an animal lover, prone to go out of her way to care for lost or hurt animals that she might encounter. Ever since she was four years old, Ashley was a cheerleader, going so far as to volunteer her time to help lead the cheer program for a local recreational football league (one of many types of volunteer opportunities in which she participated, frequently through her church). By all accounts, she was the type of person who

others could tell came from a good family and who exhibited the type of character society hopes to see from its young adults.

Ashley graduated from Liberty High School in Glen Daniel in 2018 with mostly A's and B's, as well as vocational training in dental assisting. In addition to cheering, she also ran track. After graduation, she worked at Subway, T-Rock, and Walmart for a few years before obtaining her first "big girl job" at Southern Regional Jail in 2020. At the time, Ashley was especially excited for the opportunity to work at SRJ; her uncle worked in law enforcement and had encouraged Ashley to gain experience as a correctional officer so she could potentially follow in his footsteps one day. Due to the COVID-19 pandemic, she received little in the way of formal training (consisting almost entirely of a "remote" Division of Corrections Basic Training class administered by way of videos and lectures she watched on a screen at SRJ) and instead shadowed other correctional officers as a form of on-the-job training. For an impressionable 20-year-old hoping to earn her stripes as she worked toward a career in law enforcement, one would struggle to imagine a worse training environment[1].

Over the course of the next year and a half, Ashley worked hard to earn the respect of her peers and supervisors at SRJ. Unfortunately, "working hard to earn their respect" at that time meant engaging fully in the brutal behavior, deceptive culture, and toxic working environment that earned SRJ its much-deserved

---

[1] To be sure, the lack of formal training is of no consequence with respect to Ashley's understanding of the applicable policies and procedures for the proper use of force and for the writing of incident reports. Throughout her time at SRJ, Ashley knew full well that she and the other officers were engaged in significant wrongdoing; the on-the-job training by more senior officers steeped in SRJ's toxic culture merely facilitated those officers' indoctrination of Ashley into that culture, where officers believed they were above the law and could do anything they wanted with no consequences.

reputation as a horrific place for inmates.  Ashley and the other officers in the "in crowd" of which she became a part would frequently abuse inmates (utilizing more force than necessary, "teaching a lesson" by physically retaliating against inmates, and looking for opportunities to go "hands on" with an inmate whenever possible) and then would lie and cover for each other in a variety of ways so none of the officers would get in trouble.  By doing so, Ashley "earned" a better working schedule and more desirable jobs at SRJ, including eventually working as a somewhat of a personal assistant to Warden Francis, mostly performing front-office and other non-correctional tasks.  Somewhat paradoxically, although Ashley had garnered the respect of many colleagues and supervisors through her deplorable behavior on many occasions, she never fully lost her soul: she truly did care for people in her custody at SRJ, sometimes engaging in "life talks" with them, trying to get help for those who struggled with drugs or who might overdose, and even lending a helping hand at the jail to inmates who were struggling, even if it meant being called a "hug-a-thug" by her co-workers.

The Court is well-acquainted with the facts and circumstances of the critical incidents on March 1, 2022, and the subsequent cover-up; however, a brief recitation of Ashley's involvement in those incidents may be helpful here. That morning, Ashley was doing a cell search in the medical wing when she responded to a call for officer assistance in the sally port of C-Pod where another officer was struggling with an inmate, Quantez Burks.  As Burks continued to struggle with the officer, Ashley and another C.O. joined in an effort to get Burks under control, with Ashley's primary

involvement being the removal of a mop from Burks' hands. Once Burks was under control, he was handcuffed and "escorted" to an interview room that officers knew to be a "blind spot" in SRJ; that is, he was essentially dragged with his arms wrenched up behind his back to an area the officers knew to be off-camera where they could "punish" him for engaging in the altercation outside C-Pod. While in the interview room, Ashley watched as officers slammed Burks' head into the wall and into the table, stomped on his ankles, twisted and broke his fingers, and struck him on the head and all over his body. By the time Burks was taken from the interview room, Ashley had returned to the medical wing to carry out her cell searches. Therefore, she was not present when officers finished beating Burks, dragged him to a cell in A-Pod, or continued to beat him while in that cell, including stomping on his chest. The next time Ashley saw Burks was when she was requested to bring a "crash bag" to the cell in A-Pod where officers had dragged him. After delivering the crash bag, she also retrieved oxygen for him before returning again to the medical unit. That was the last time she saw Burks before he was declared dead.

Although unfortunate, it is a natural tendency for people who have participated in nefarious conduct, particularly when those people are among a tight-knit group like the officers at SRJ, to attempt to minimize and cover up the conduct in an effort to avoid accountability. Given the culture of beating inmates and covering up those beatings at SRJ at the time, it is unsurprising that those same officers continued in their pattern of trying to elude responsibility. Except this time, the

inmate had died, and the officers knew they would be in big trouble if anyone found out what happened.  Turns out, they were right.

The Court has written at length on the injustices advanced by correctional officers who cover up the illegal abuse of inmates.  *See generally* ECF No. 283.  To be sure, Ashley participated in the initial cover-up.  Although she was not a supervisor, she was present and participated in conversations wherein officers were instructed to lie and to tell investigators that Burks was resisting and being combative.  She also falsified her own incident report and lied to investigators both during the initial investigation and later when she was interviewed by the FBI in August 2023.  Later that month, she was placed on administrative leave from SRJ and in November 2023, she was charged in multiple counts of the Indictment in this case.

Ashley's character arc has taken a dramatic turn since her participation in Burks' death and cover-up in March 2022.  Then a 22-year-old hotheaded part of the "in crowd" at SRJ, Ashley is now a 25-year-old mother whose heart has softened.  She has pleaded guilty, accepted responsibility, and taken steps towards trying to right the wrongs she committed, including testifying against her codefendant Chad Lester.  She looks back with regret, shame, and embarrassment on the person she was in 2022 and on the harm she caused, not only to Burks, but to other inmates who were abused and whose abuse was covered up by the officers at SRJ.  She recognizes and accepts that regardless of her personal maturation, there are consequences for her actions.  But personally, she has gown and learned and does not need to be taught a lesson for her to grasp the magnitude of her past conduct.

Since her guilty plea to a single-count Information on August 8, 2024, the Probation Office conducted a presentence investigation and prepared a report ("PSR"), which has been reviewed by the parties and revised before being submitted to the Court. Counsel has lodged several objections to the PSR, including two that relate to the calculation of the advisory Guideline range and one that identifies several grounds for a departure or variance. Those objections, which are preserved in the Addendum to the PSR, are incorporated herein by reference. Accordingly, this Sentencing Memorandum will address those objections only to the extent that additional discussion is necessary. Regardless of the Court's calculation of the advisory Guideline range, Ms. Toney requests a sentence of 5 years' probation, the first 3 years of which to be served on home confinement.

## I. SENTENCING FACTORS

In post-*Booker* sentencing, district courts are to calculate the appropriate Guideline range, consider that range in conjunction with other relevant factors under 18 U.S.C. § 3553(a), and impose a sentence. In this case, a sentence of 5 years' probation with the first 3 years to be served on home confinement would be sufficient, and not greater than necessary, based on:

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant;**

There is no excuse for Ashley's conduct in failing to intervene to stop the assault on Quantez Burks or in participating in the cover-up. Full stop.

Insofar as 18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and Ashley's history and characteristics, however,

6

context and nuance are essential to determining the appropriate punishment for that conduct.

As to the instant offense, the evidence establishes that Ashley was not an active participant in the assault on Burks. Although she did report to the C-Pod sally port, her involvement at that time included removing a mop from Burks' hands and taking it out of the room. Once things moved to the interview room, she was in the room and apparently shouting or yelling but did not lay hands on Burks at all[2]. She then left the room before Burks was taken back to A-Pod and beaten some more. Thus, although she could have and should have taken steps to stop the assault, her culpability must be judged in comparison to those officers who were actively participating in the beating. Furthermore, as a practical matter, it is unlikely that Ashley could have done anything to actually prevent the beating; assaults on inmates were part of the culture at SRJ, one young female would have had no chance of holding off several older male officers, and the nearest supervisor, Chad Lester, appears to have been nearby and allowed the beating to continue, or at the very least led the cover-up. And once Ashley left the room, she had no knowledge of, or ability to prevent, any further abuse – including the numerous stomps to Burks' chest in the cell in A-Pod.

It is also worth mentioning that nobody intended to kill Quantez Burks. While inmate beatings were normalized at SRJ, killings were not. Officers knew – as

---

[2] As noted in the Objections to the PSR and the Probation Officer's Response, David Crouse did tell investigators that Ms. Toney punched Burks while in the interview room. That is the only time anyone has said that she touched Burks, including Crouse's own later statement to the FBI. Accordingly, it is safely established that Ms. Toney did not physically participate in the assault.

7

demonstrated by this case – that an inmate death would bring additional scrutiny that would make it far more difficult to evade responsibility. Whether the beating of Burks simply went too far or whether he had an underlying condition that exacerbated the effects of the assault, Ashley could not have known at the time that she was standing by and watching someone get killed[3]. Although the end result is unfortunately the same, Ashley's frame of mind and understanding of the gravity of the situation suggests a mitigating factor with respect to her failure to intervene.

Turning to the ensuing cover-up, Ashley is wholly accountable for her own lies both in her incident report and in her interviews with investigators. She was also complicit in the larger conspiracy that attempted to prevent any of the responsible officers from facing the consequences of their actions. However, her participation in that conspiracy appears to be akin to the role of cheerleader: standing by and echoing the directions of her supervisor, Chad Lester, and adding numbers to the group of officers who pressured others to "stick to the story" that Burks was combative and resisting. But again, the cover-up is an unsurprising and sadly natural extension of the assault itself; it is more remarkable (and commendable) that some of the officers did the right thing and came forward with the truth. Had Ashley been one of those officers, it is possible that she may not have been prosecuted at all. Thus, by being

---

[3] There is also some question as to when Burks died and when the causal blow(s) were delivered; a question that is nigh impossible to parse out given the sequence of events. If, for example, Burks would have survived had officers not stomped on his chest in the cell in A-Pod, then Ashley's case looks different because Burks would be the victim of an assault she failed to stop but not a killing. Given that possibility, there is an argument that Ashley's culpability arises from failing to intervene to stop a beating, not to intervene to stop a killing.

8

charged and convicted in this case, she is forced to live with the consequences of her role in the cover-up.

In sum, as horrific as an inmate assault resulting in death, followed by an extensive cover up, is, the nature and circumstances of Ashley Toney's role in that conduct suggest a lesser degree of culpability than those officers who actively beat Quantez Burks and who led the cover-up from a position of authority.

Turning to Ashley's history and characteristics, her lack of criminal history and strong family upbringing are not the mitigating factors that they otherwise might be. The defendants in this case would not have been officers at SRJ if they had criminal records and whatever morals they may have been instilled with as a child are of no help when trying to explain their conduct. What is mitigating for Ashley, however, are the circumstances in which she found herself as a young female officer at SRJ and the significant maturing she has done over the last 18 months.

At the time of the instant offense, Ashley was 22 years old. "[T]here is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." U.S.S.C., *Youthful Offenders in the Federal System*, at 5 (2017) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf) (last visited May 29, 2025). Amendment 829 to the Guidelines Manual, which was approved in April 2024 and made effective November 1, 2024, recognizes the mitigating factor of youth in criminal conduct. Specifically:

> A downward departure . . . may be warranted due to the defendant's youthfulness at the time of the offense . . . . Certain risk factors may

9

> affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including *environment*, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and *susceptible to outside influence* as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistence from crime. Accordingly, in an appropriate case, the court may consider whether *a form of punishment other than imprisonment* might be sufficient to meet the purposes of sentencing.

U.S.S.G. § 5H1.1 (emphases added).

In light of these acknowledgements contained in the recent Guideline amendments, there is empirical support for the proposition that Ashley's position as a young female correctional officer trying to earn the respect of her peers is a mitigating factor at sentencing. Due to her age, she was more susceptible than the average person to the outside influences of her fellow officers at SRJ (even her peers) and more likely to engage in impulsive and risky behaviors such as abusing inmates. That she was also a female in a male-dominated line of work only exacerbates her temptation to engage in behaviors likely to earn the respect of her peers, even when that behavior is immoral or illegal. On top of all that, her desire to follow in her uncle's footsteps one day as a law enforcement officer further increased her need to "succeed" in her job at SRJ. In her mind, at that time, she was forced to choose between conforming to the toxic culture at SRJ on the one hand and leaving her job as a C.O. on the other, which meant giving up on (or at least delaying) her dream of

becoming a cop. It is understandable how a young, eager, impressionable girl might venture down a very dark path amid those circumstances. Her young age at the time of the offense should therefore be given significant consideration in support of a home confinement sentence for Ashley.

Finally, the significant changes in Ashley's life over the last 18 months, including her own maturation process and the birth of her son, counsel in favor of a downward variance. While nothing can undo the significant harm she caused by her actions with regard to Quantez Burks and the subsequent cover-up, Ashley is quite simply not the same person now that she was then. Her moral and ethical arc between the time she was charged and the time she pled guilty is nothing short of remarkable. The instant charges forced her to examine her own character and conduct with depth and sincerity; the person she discovered after that soul searching was embarrassing, reprehensible, and resembled nothing of the person she was raised to be. She realized that her co-workers at SRJ – people who trained her, "had her back," and spent 50- and 60-hours per week with her over the last few years (at a time when many of her peers would have been in college) – were not her friends and were not good influences on her. Having been removed from that environment and able to reflect back, she now fully appreciates the depravity of her conduct and the person she was back then. Her statement of acceptance of responsibility demonstrates how and how much she has changed in that way.

Also apparent from that statement is the effect on her of becoming a mother. Her son was born in February 2024 and will not yet be a year-and-a-half old by the

11

time she is sentenced. Those who knew Ashley before she became a mother can attest to how it has softened her, instilled a renewed appreciation for the value of life, and given her purpose that she previously had searched for. She is in a committed relationship with the baby's father, who is a City of Beckley police officer. In addition to being an outstanding father, he has also been a transformative figure for Ashley: loving, steadfast, committed, and an upstanding citizen, Ashley could not ask for a better partner or father of her child[4].

In sum, over the course of the last 18 months, Ashley has grown up significantly – a sign both of her young age at the time of the offense and the significant life events she has endured since. A term of incarceration in the custody of the Bureau of Prisons would be too harsh in light of these factors.

**(2) The need for the sentence imposed to:**
   **a. Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;**
   **b. Afford adequate deterrence to criminal conduct;**
   **c. Protect the public from further crimes of the defendant; and**
   **d. Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

Ashley Toney is not a threat to recidivate, requires no further deterrence from criminal conduct, and does not need any type of training, care, or treatment within the setting of the Bureau of Prisons[5]. It is recognized, particularly in light of the

---

[4] It would have been easy for a man to give up on Ashley under the circumstances. However, he has been by her side both emotionally and physically every step of the way, including taking time off work to travel to Charleston with Ashley for court or attorney meetings, often sitting alone or with their son while Ashley is busy with her case. It is truly commendable – a testament both to his character and to Ashley's evolution.
[5] Her young son would, however, benefit from having his mother in his life during his formative years where she can adequately provide for him while his father is working in law enforcement.

12

Court's Memorandum Opinion, ECF No. 283, commenting on Chad Lester's sentencing, that the goals of recognizing the seriousness of the offense, promoting respect for the law, providing just punishment, and deterring others from engaging in similar conduct are likely to be top of mind for the Court. A sentence of home confinement for Ashley will not offend those concepts. Rather, a federal felony conviction in and of itself is incredibly punitive for a young mother from a background like Ashley. Whereas once she dreamed of a career in law enforcement, this conviction means that her dream is gone along with the vast majority of other decent careers she might have otherwise pursued. Time behind prison walls will not change that; it will only remove her from her child's life during a time of great importance to the child. And when accounting for the other factors both above and below, a sentence confining her to her home for a period of 3 years will adequately reflect the seriousness of the offense and promote respect for the law. Finally, in light of the

sentences handed down to Ashley's more culpable codefendants, other potential offenders will be more than adequately deterred.

**(3) The kinds of sentences available;**

A sentence of probation is available under statute.

**(4) The kinds of sentence and the [Guideline] sentencing range;**

There are two outstanding objections to the PSR's Guideline calculation:

**A. Base Offense Level**

The Government has requested that the Base Offense Level be 43 based on a cross-reference to Felony Murder under § 2A1.1(B). As the Probation Officer correctly notes, there is no evidence of premeditation and the offenses listed in 18 U.S.C. § 1111 do not include the underlying offense. Accordingly, the Government's objection should be overruled.

Undersigned counsel has interposed an objection on behalf of Ms. Toney requesting that the Base Offense Level be 12 based on a cross-reference to Involuntary Manslaughter pursuant to § 2A1.3. Before turning to the merits of this objection, it should be noted that no Guideline adequately accounts for a defendant's illegal conduct in *failing to act* in the way that Ms. Toney did. Simply put, the Guidelines considered for the cross-reference from 2H1.1 generally account for a defendant's actions – whether intentional, reckless, negligent, or otherwise – that result directly or indirectly in the death of another person. It seems axiomatic that an individual who fails to act to prevent a harm is less culpable than the individual

who perpetrates that harm, yet the Guidelines would treat both individuals the same. That concept is even more germane when an individual fails to intervene to prevent one act (e.g., a beating or assault) that results in a far worse consequence than the individual anticipated; here, death. That is particularly true when it has not been established that Burks died as a result of the assault in the interview room (for which Ashley was present and able to intervene) and not as a result of the subsequent assault in A-Pod (for which she was not present, nor aware, and was thus unable to intervene).

Notwithstanding the lack of an adequate Guideline proxy for Ms. Toney's conduct, counsel has endeavored to find the most analogous case and would direct the Court to Tou Thau, one of Derek Chauvin's codefendants who failed to intervene to prevent George Floyd's death at the hands (or knee) of Chauvin. *See generally United States v. Chauvin et al.*, 0:21-cr-00108 (D. Minn. 2021). The District Court in Thau's case sustained an objection to the PSR and applied the cross-reference for Involuntary Manslaughter, finding that Thau "acted grossly negligently in that he acted with a wanton or reckless disregard for human life, knowing that his conduct was a threat to the lives of others or having knowledge of such circumstances as could reasonably have enabled him to foresee the peril to which his act might subject others." *Id.* at ECF No. 406 at 2 (quoting *United States v. Schmidt*, 626 F.2d 616, 617 (8th Cir. 1980)). The circumstances of that case are largely the same in that the defendant was convicted of deprivation of rights under color of law for failing to intervene in actions committed by fellow officers and the victim ultimately died of the conduct that

the defendant failed to prevent. Thus, an application of the Involuntary Manslaughter guideline appears to be equally as appropriate here as there. The difference would be that in Thau's case, the defendant knew that his conduct was a threat to George Floyd's life and could reasonably foresee the peril to which he was subjecting Floyd by failing to intervene. Here, there is no evidence that Ashley knew or reasonably should or could have known that by not intervening she was potentially subjecting Quantez Burks to being killed. Insofar as no weapons were employed against Burks, some of the assault took place outside of Ashley's presence, and his cause of death involved – at least to some extent – underlying medical conditions that exacerbated the effects of the assault, the evidence does not support a finding that Ashley sufficiently appreciated the potential consequences of failing to intervene to support a cross-reference to anything more serious than a Base Offense Level of 12 for Involuntary Manslaughter under § 2A1.3.

**B. Mitigating Role**

Counsel's second objection on behalf of Ms. Toney is to the lack of a Mitigating Role adjustment under § 3B1.2[6]. As recognized in the commentary, this is largely a fact-specific inquiry taking into account the factors listed in Application Note 3. With

---

[6] Counsel takes great umbrage at the PSR's statement that "the probation officer has concerns about this objection, as it may bring into question the defendant's acceptance of responsibility." PSR p.33. Ashley has thoroughly demonstrated her acceptance of responsibility throughout this case, including in her statement contained in Paragraph 36 of the PSR. Conversely, counsel has an ethical obligation to advocate zealously for Ms. Toney, including pursuing non-frivolous objections and arguments with respect to her sentencing position. The Probation Office's insinuation that a defendant is not adequately accepting responsibility when her counsel advocates for a Guideline adjustment with which the Probation Officer disagrees offends the basic notion of zealous advocacy that forms the cornerstone of our criminal justice system.

respect to the assault on Burks, Ashley did not instigate it, direct it, or even physically participate in it. Nor did she exercise or influence any decision-making authority. With respect to the cover-up, the same is true. The leader of those efforts, as the Court is well-aware, was Chad Lester. And while Ashley did echo Lester's instructions to less experienced C.O.'s to encourage them to lie in their incident reports and to investigators, she lacked Lester's position of authority and influence. Accordingly, based on the totality of the circumstances, she is demonstrably less culpable than most of her codefendants and therefore should receive a mitigating role reduction.

**C. Guideline Calculation**

With a Base Offense Level of 12, she would receive enhancements of 10 levels[7] (¶¶ 40, 41, and 43) and a 3-level downward adjustment for Acceptance of Responsibility for a Total Offense Level of 19 and an advisory Guideline range of 30-37 months. Any further adjustment for a Mitigating Role would lower the Guideline range to 24-30 months (Total Offense Level 17), 21-27 months (Total Offense Level 16), or 18-24 months (Total Offense Level 15). Any of those advisory ranges supports

---

[7] Ms. Toney concedes that the enhancement for restraint of a victim under § 3A1.3 is correctly applied because Burks was restrained. However, a downward variance is appropriate because Ms. Toney had no role in restraining him and the fact that he was restrained if of little relevance to Ms. Toney's failure to act.

the requested sentence of 5 years' probation with the first 3 years to be served on home confinement.

**(5) Any pertinent policy statement;**

The requested sentence is not precluded by any pertinent policy statement.

**(6) The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and**

The most analogous case counsel has been able to find is that of Tou Thao, one of the Minneapolis, Minnesota, police officers who was convicted of deprivation of rights under color of law in violation of 18 U.S.C. § 242 for failing to intervene to prevent the unlawful use of force by Officer Derek Chauvin against George Floyd. *See generally United States v. Chauvin et al.*, 0:21-cr-00108 (D. Minn. 2021). Thao was a long-serving officer in the Minneapolis Police Department who stood idly by for more than nine minutes as Derek Chauvin knelt on Floyd's neck. He went to trial and was convicted of two counts of violating 18 U.S.C. § 242 and received a sentence of 42 months' imprisonment. Given the numerous mitigating circumstances surrounding Ms. Toney's case, including her young age, inexperience as a corrections officer, acceptance of responsibility, and post-offense conduct, a sentence of probation would present a warranted disparity from that of Officer Thau. Whereas Thau received a

sentence of 42 months' imprisonment, a sentence of 36 months' home confinement for Ashley would represent a proportionate disparity.

**(7) The need to provide restitution to any victims of the offense.**

To date, no request for restitution has been received.

## II.     CONCLUSION

WHEREFORE, for the reasons set forth herein, Ashley Toney requests that regardless of the advisory Guideline range, the Court impose a sentence of 5 years' probation with the first 3 years to be served on home confinement.  Counsel intends to call three character witnesses on Ms. Toney's behalf and anticipates that the sentencing hearing will last approximately sixty to ninety minutes.

Respectfully submitted this 2nd day of June 2025.

**ASHLEY TONEY**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Wesley P. Page**
Wesley P. Page, Bar No. 10529
Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, West Virginia 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail:  wesley_page@fd.org